```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED JUL 25 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                   :
BASEBALL QUICK, LLC,                               :
                                                   :
                                Plaintiff,         :        11-cv-1735 (KBF)
                       -v-                         :
                                                   :        OPINION & ORDER
                                                   :
MLB ADVANCED MEDIA L.P. et al.,                    :
                                                   :
                                Defendants.        :
                                                   :
------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

    We may admit without embarrassment that the great American pastime,

baseball, can at times prove boring to watch; games may take hours to complete,

intersected by short bursts of exciting action.  The patent at issue in this case

sought to invent a novel method of solving the related problems of not wanting to

miss game action while also not wanting to invest the necessary time in slogging

through an entire game.

    On June 13, 2000, Baseball Quick, LLC ("BQ") filed a provisional patent

application with respect to what became U.S. Patent No. 7,628,716 (the "'716

Patent" or the "Patent"), with respect to its invention.  Shortly thereafter, BQ

alleges that it disclosed the concept of its invention to Major League Baseball

("MLB"), the parent company for MLB Advanced Media, L.P. ("MLBAM").  MLB

informed BQ that it was not interested in a business arrangement and, in March

2001, MLB announced its own "Condensed Games" product which also sought to

condense baseball game action.  The parties have been locked in legal disputes ever

since, with BQ asserting that Condensed Games infringes on its invention, and MLBAM asserting a variety of defenses including invalidity and non-infringement.

Pending before this Court are two motions: the first is for claim construction as to eight terms in the '716 Patent; the second is a motion by MLBAM for partial summary judgment on the issue of whether BQ may assert provisional rights pursuant to 35 U.S.C. § 154(d)(2). This Opinion & Order sets forth the Court's resolution of both motions.

I.     THE PATENT

BQ's initial patent application was filed on June 13, 2000; BQ filed a non-provisional application a year later, on June 9, 2001, and a preliminary amendment to that application in 2002. On March 27, 2003, the application was published (the "2003 Published Application"), and it is this Application that must be compared to the issued Patent for purposes of MLBAM's motion for partial summary judgment as to provisional rights. The Patent issued on December 8, 2009; all claims are currently subject to reexamination pursuant to an Office Action Determination issued November 27, 2012.

As issued, the Patent is entitled "Method of Recording and Playing Baseball Game Showing Each Batter's Last Pitch." (Pak Decl. Ex. A, Col. 1, lines 1-3, ECF No. 153.)

The invention is described as a method of providing a subscription for viewing an edited recording. It "broadly relates to a method for reducing the time needed to enjoy a complete baseball game, and especially relates to a method for

2

replaying or rebroadcasting a baseball game in a manner so that the viewer sees

only the outcome-determinative actions that occurred during the original game."

(Id. Ex. A, Col. 1, lines 15-20.)  The method involves recording an entire game and

"editing it to retain the action portions, i.e., the last pitch thrown to the batters for

each turn at plate," (id. Ex. A, Col. 1, lines 22-24), and retaining the game action

resulting from that pitch (id. Ex. A, Col. 1, lines 59-60).  This process results in a

recording of "each safe base hit, each walk, strike out, sacrifice fly, ground out, etc."

(Id. Ex. A, Col. 1, lines 60-62.)  Fielding would also be recorded. (Id. Ex. A, Col. 1,

lines 61-63.)  The video resulting from this editing process would be approximately

ten to fifteen minutes.  (Id. Ex. A, Col. 1, line 64.)  Finally, "some additional

material (e.g. narrative) can be included to explain pitching changes, pinch runners,

and other substitutions that may affect play."  (Id. Ex. A, Col. 2, lines 1-3.)

> According to the Patent's specification:

> The invention does not constitute merely a compilation of the
> highlights of a particular baseball game.  Rather, the invention is
> directed to making a record of each and every outcome-determinative
> action that takes place during the complete game, while eliminating all
> of the action that ultimately does not impact the outcome.

(Id. Ex. A, Col. 2, lines 60-65.)  The edited recording would be available to viewers

on a subscription basis.  (Id. Ex. A, Col. 2, lines 40-43.)

A.   Claims

The Patent contains five claims (the "Patent Claims"), the first of which is

independent while the remaining four claims are dependent:

> 1. A method of providing a subscription for viewing a recorded
> baseball game in which players from each team appear at bat, and

3

attempt to place a pitched baseball into play and to reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method comprising: (1) recording each appearance-at-bat for every player and game action resulting from an appearance-at-bat to produce a game recording; (2) editing the game recording of each appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch; (3) obtaining subscribers for viewing the edited record and (4) playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers.

2.  The method of claim 1 wherein the edited recording for a nine-inning baseball game is about 15 minutes.

3.  The method of claim 1 wherein said step of playing or broadcasting the edited recording for viewing is conducted over the Internet.

4.  The method of claim 1 wherein said step of playing or broadcasting the edited recording for viewing is conducted by playing a videotape recording.

5.  The method of claim 1 wherein the edited recording contains audio explaining any substitution of players.

(Id. Ex. A, Cols. 3-4, lines 21-26 and 1-24.)

The 2003 Published Application consisted of the following ten claims (the

"Application Claims"):

1.  I claim the name "Baseball Quick" as our trademark.  The name is an integral part of our invention and describes in 2 words how a fan can view a baseball game.  "Baseball Quick" is a method of recording and editing a baseball game by showing only the last pitch to each batter and any subsequent action.  Any action between the last pitch of any batter to the last pitch of another batter shall also be recorded. The result shall be a complete game of every player at bat in approximately 15 minutes.

2. I claim that this method of dispensing a baseball game can be used in the following medias.  Television, Radio, Internet, Telephone, and Pagers.

3. I claim there are many ways "Baseball Quick" can be shown or heard.  For example it can be dispensed, a) inning by inning while the game is in progress, b) 3rd inning, or 6th inning review while the game is in progress, or c) the whole game shown or heard after the game is over, d) all of the above can also be dispensed on the internet telephone, pay per view or any hand held device.  Finally all these methods can be repeated at prime time slots or the next morning.

4. A method of recording and editing a baseball game in which players from each side appear at bat, in turn, and attempt to place a pitched baseball into play and reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method comprising:

> recording the appearances-at-bat for each player, in turn, plus other action that ensues during or after the appearances-at-bat;

> editing the recorded appearances-at-bat to leave only the last pitch thrown to each player, plus any action ensuing after that pitch and any attempts of runners on base to advance to another base; and

> presenting the edited recorded game as a condensed recorded game showing important action portions of the game.

5. The method according to claim 4 wherein said editing includes omitting all pitches that do not result in either the player at bat placing the ball into play, producing an out, or the player at bat or another player advance to another base.

6. The method according to claim 4 wherein the edited recorded game is about 15 minutes for a nine-inning game.

7. The method according to claim 4 wherein said edited recorded game comprises only a specific portion of the game.

8. The method according to claim 4 wherein said step of presenting the edited game as a condensed recorded game includes delivering the recorded game to subscribers over the Internet.

9. The method according to claim 4 wherein said step of presenting the edited game as a condensed recorded game includes distributing the recorded game as a video recording.

10. The method according to claim 4 wherein the step of editing leaves in narrative material to explain substitution of players.

(Id. Ex. B.)

B.    Prosecution History

The '716 Patent wound its way through the United States Patent and Trademark Office ("PTO") for more than eight years prior to its issuance. The parties dispute the relevance and importance of a number of events and statements made during prosecution. The 2003 Published Application, which would ultimately become the '716 Patent, was first published in March 2003; in May 2003, the PTO issued a Final Office Action rejecting Application Claims 4-10 as indefinite and vague. (Franecki Decl. Ex C at 6, ECF No. 95.) On August 27, 2003, plaintiff responded by submitting new claims 11-22. (Id. Ex. D.)

According to the remarks accompanying plaintiff's August 2003 submission, "the sum total of all the action of an entire baseball game that is reflected in the box score for each participant in the game is consolidated into about 10-20 minutes of video." (Id. Ex. D at 6.) Plaintiff stated that "[a]nyone with even a rudimentary knowledge of the game of baseball can envision what aspects of the pre-recorded game to remove and what to retain in the editing process to accomplish the stated

6

result based on the originally filed application." (Id. Ex. D at 8.)  Plaintiff also

stated that:

> Of course, one can, within the spirit of this invention, include a minor
> amount of extraneous recorded information in the edited version, e.g.,
> a video clip of a young fan watching the game, or a video clip of a coach
> or manager giving signals or changing the pitcher, so as to accent the
> summary presentation provided by this invention.  Thus, the use of the
> word "substantially" to modify certain aspects of the claimed method.

(Id.)  Plaintiff further stated that the "objective of the invention" was to present a

"complete summary of the action that is recorded in the original game, as reflected

in the box score for each participant in the game, so that the action is consolidated

into about 10-20 minutes of video."  (Id.)  Plaintiff distinguished the invention from

a "'highlight' tape of a baseball game, as for example one might see on ESPN's

SportCenter" because the invention would "show every outcome-determinative pitch

to each batter, while substantially eliminating all non-outcome determinative action

from the edited recording."  (Id. Ex. D at 9.)  As a result, according to plaintiff, the

"edited video shows only the outcome of each at bat in the game."  (Id. Ex. D at 10.)

Claim 11 in this submission claims:

> A method of replaying or rebroadcasting a baseball game, or a portion
> thereof, for which a video recording of the baseball game, or a portion
> thereof, was produced containing substantially every pitch thrown to
> every batter from a first pitch to a final pitch and game action
> resulting from every pitch, together with other action occurring during
> each appearance by every batter, the method comprising (a) editing the
> video recording to produce an edited recording, the edited recording
> having video of substantially only (i) the final pitch thrown to every
> batter and any game action resulting from the final pitch; (ii)
> successful attempts of runners on base to advance to another base not
> associated with the game action resulting from the final pitch and (iii)
> unsuccessful attempts of the runners on base to advance to another
> base resulting in an out not associate with the game action resulting

from the final pitch and (b) playing or broadcasting the edited
recording for viewing.

(Id. Ex. D at 3.)

In a submission dated February 18, 2004, plaintiff added further claims—

numbers 23 through 29—with claim 24 ultimately becoming Patent Claim 1.  (Id.

Ex. E at 4-5)  Both claims 23 and 24 added the limitation of "obtaining subscribers

for viewing the broadcast of the edited recording."  (Id. Ex. E at 4-6.)

In a further submission dated June 10, 2005, plaintiff cancelled claims 1-22

and amended claim 23 (as well as others).  (Id. Ex. I.)  In that amendment, plaintiff

made the following changes[1] to claim 23:

> A method of replaying or rebroadcasting a baseball game, or a portion
> thereof, for which a video recording of the baseball game, or a portion
> thereof, was produced containing substantially every pitch thrown to
> every batter from a first pitch to a final pitch and game action
> resulting from every pitch, together with other action occurring during
> each appearance by every batter, the method comprising (a) editing the
> video recording to produce an edited recording, the edited recording
> having video of substantially only consisting essentially of . . . .

(Id. Ex. I at 2.)  In its remarks presented with this amendment, plaintiff stated that

claims 23 and 24 had been amended and others added

> in a way such that they are directed specifically to a method in which a
> baseball game . . . is edited . . . to remove "substantially" all aspects of
> the pre-recorded game that do not directly impact the outcome of the
> game, i.e., save for the outcome-determinative action associated with
> each batter that comes to the plate and a minor amount of additional
> content (such as between inning banter by the announcers, occasional
> crowd shots, or certain foul balls that may have fan interest).  In this
> way, essentially all the action of an entire baseball game that is
> reflected in the box score for each participant in the game is
> consolidated or condensed into about 10-20 minutes of video.

---

[1] Deletions to claim 23 are denoted by "strike-throughs," while additions are denoted by underlines.

(Id. Ex. I at 7-8.) Plaintiff also specifically sought to distinguish claims 23 through 34 over certain prior art—SeasonTicket and Rangan et al.—stating that plaintiff sought protection for a method of making an edited recording, not the content of the edited recording itself. (Id. Ex. I at 9.) In fact, plaintiff stated that the claimed method "involves a pre-selection of the content of the edited recording that breathes patentability into the invention." (Id. Ex. I at 11.) According to plaintiff, prior art

> generally represents a subjective assessment of those aspects of the game that a viewer might find particularly interesting. The present invention, in contrast, establishes an objective, pre-selection of the game action to be included, selecting essentially all of the game action that contributes to the box score of the game.

(Id. Ex. I at 12.) Moreover, plaintiff argued that nothing in the prior art suggests a method of "distilling the recording of a baseball game down to essentially only those actions that contribute directly to the outcome of the contest." (Id.)

According to plaintiff, the method teaches an objective process and "anyone with even a rudimentary knowledge of the game of baseball can envision what aspects of the pre-recorded game to exclude and what to retain in the editing process to accomplish the stated result—there is nothing subjective in carrying out the claimed method." (Id. Ex. I at 13.) In explaining the use of the words "essentially" and "substantially," plaintiff stated that one could, within the spirit of the invention, include a "minor amount of extraneous recorded information in the edited version," again giving the example of the young fan or a coach giving signals. (Id.) Plaintiff stated that the words "essentially" and "substantially" were included to prevent one from "slavishly limiting the literal scope of the method to the

essential actions"; plaintiff also stated, however, that "[t]he objective of the invention is to present a complete summary of the action that is recorded in the original game, as reflected in the box score for each participant in the game, so that the action is consolidated into about 10-20 minutes of video." (Id.)

In a Final Office Action dated June 23, 2005, the PTO rejected claims 23 through 40 as obvious. (Id. Ex. J at 2.) On September 8, 2005, plaintiff filed a "Pre-Appeal Brief Request for Review," in which plaintiff argued various points of distinction from prior art. (Id. Ex K.) For instance, with regard to HistoricFilms, plaintiff argued that it is simply a video clip of historic highlights and "[n]o part of the clip could even be considered any one of (1) A method of replaying or rebroadcasting a baseball game (claim 23); (2) A method of providing a subscription for viewing a recorded baseball game (claim 24) . . . ." (Id. Ex. K at 2 n.1.)

In defending its claims, plaintiff presented it as a method to "show essentially all of, and essentially only all of, the outcome-determinative pitches to each batter (specific game action); while substantially eliminating all non-outcome-determinative action from the edited recording." (Id. Ex. K at 4.) In distinguishing the invention from prior art, plaintiff argued that highlight reels represent "a subjective assessment of those aspects of the game that the editor believes a viewer might find particularly interesting. The present invention, in contrast, establishes an objective, pre-selection of the game action to be included in the edited recording." (Id.) Plaintiff then stated that the invention shows game action "that occurs following the last pitch thrown to each batter for each turn at the plate, or the

10

tagging out or safe advancement of a base runner as may occur in a pick-off play or if the runner is caught stealing." (Id.)  Plaintiff reiterated that there is "nothing subjective in carrying out the claimed invention." (Id.)  Plaintiff further reiterated that "[t]he objective of the invention is to present a complete summary of the action that is recorded in the original game, as reflected in the box score for each participant in the game, so that the action is consolidated into about 10-20 minutes of video and then that product is provided to subscribers." (Id. Ex. K at 5.)

Plaintiff then received a Notice of Panel Decision from Pre-Appeal Brief Review dated October 25, 2005, which rejected all claims as unpatentable over prior art—in particular, ProQuest Producing Sports Channel ("ProQuest"). (Id. Ex. L.) In response, plaintiff filed an amendment and accompanying remarks, cancelling claims 1-22, 26 and 31, but maintaining claims 23-25, 27-30 and 32-40. (Id. Ex. N at 6.)  Plaintiff reiterated that its claimed invention was "NOT the production of a highlight show!!  In stark contrast, the claimed method is an objective procedure for producing a specific edited version of a baseball game in which every batter's appearance at the plate is shown . . . ." (Id. Ex N at 8-9.)  In contrast, plaintiff argued that "[a] highlight show edits a baseball game according to the **subjective** whims of the individual doing the editing . . . . The present invention, in a completely different manner, requires totally **objective** treatment of the baseball game.  The product of the method does not change depending on who is assigned the task of editing the video." (Id. Ex. N at 9 (emphasis in original).)  Further emphasizing this point, plaintiff stated:

The editing is not varied based on the bias or interests of [the] person doing the editing and is not influenced by the nature of the game itself (its length, the number of hits made or runs scored.)  The claimed method is not simply a matter of choice that varies from one time to another.  Nothing in the prior art's production of a "highlight" show provides any suggestion of the radically different approach embraced by the claimed method.

(Id. Ex. N at 10.)[2]  Plaintiff then provided further detail stating

[T]he edited video shows substantially only the outcome of each at bat in the game (all of the "pay-off pitches"), such as the strike-out pitch, the base hit, the home run, the hit batter, the ground out, the fly out, the double play ball, etc.  Obviously, such a record is not merely a highlight reel—indeed much of the action required to be included by applicants' claimed invention would not even be considered a highlight.

(Id. Ex. N at 11.)

Plaintiff's appeal of the rejection proceeded.  In its appeal brief filed on August 21, 2006, plaintiff again argued that its invention was fundamentally different from ProQuest and other "highlight reel" inventions.  (Id. Ex. O at 2.) Plaintiff argued that it was claiming a "specific and consistent method or algorithm which can be applied to the editing of a baseball game . . . The essence of that method, as described and claimed, is in its simplest terms, to show the last pitch to each batter.  In other words, every batter is shown for every at "bat," but only one pitch to each batter is retained in the edited game, namely the last pitch to each such batter."  (Id. (emphasis in original).)

---

[2] Later in the same submission, plaintiff made a similar statement, contrasting a set of highlights consisting of a "subjective assessment" of what "a viewer might find particularly interesting" to the invention's "objective, pre-selection of the game action to be included."  (Id. Ex. N at 12.)  As a result, "[i]n a nine inning baseball game this would require at a minimum 54 pitches, with a typical number being about 70-85 (and the resulting game action)."  (Id.)

In a Substitute Brief on Appeal filed April 1, 2008, plaintiff made the same points again, referring to the claimed invention as an "objective procedure" as to which there was "no subjective component to selecting the essential aspects of the original video to include in the edited video of the claimed invention." (Id. Ex. P at 8-9.)  Similarly, plaintiff stated in the brief that "[t]he essential product of the method does not change depending on who is assigned the task of editing the video." (Id. Ex. P at 9.)[3]  Attached to this and other filings by plaintiff in support of its prosecution of the Patent is a letter from plaintiff to MLB in August 2000, which describes the invention as editing a film or video tape to "retain the action portions, i.e., the last pitch thrown to the batters for each turn at the plate." (Id. Ex. P at 33.)

The Board of Patent Appeals held oral argument on plaintiff's appeal on June 9, 2009.  At that hearing, counsel for plaintiff reiterated that the invention is an "objective way of repackaging a baseball game." (Id. Ex. R at 2.)  He argued further that "[w]hat defines, I think, our invention from the art is the Inventors require objectively that each last pitch is part of this record," and that every pick-off play "has to be part of our recording." (Id. Ex. R at 4.)  Moreover, plaintiff's counsel stated that "[y]ou don't make any decision on what plays to keep in the claimed method.  It's dictated.  It's objective." (Id. Ex. R at 5.)  Finally, plaintiff's counsel ends by arguing, in substance, that the invention requires the inclusion of all strike-outs even in a game that involves an unusually high number of strike-outs, and that

---

[3] In this "substitute" brief, plaintiff also refers to the invention as providing a "consistent method or algorithm" (id. Ex. P at 10) for which "every batter is shown for every at 'bat'" (id. Ex. P at 11 (emphasis in original)).

this aspect differs from a highlight reel that would likely eliminate many of the strike-outs as uninteresting.  (Id. Ex. R at 7-8.)

The Board of Patent Appeals issued its decision on August 3, 2009.  A majority of the panel (the "Majority") affirmed the rejection of, inter alia, claim 23 but reversed the rejection of claim 24.  (Id. Ex. S at 12.)  The decision states that "We interpret 'edited recording having video consisting essentially of' as necessarily including the three categories of action recited in claim 23, and as optionally including any additional action category listed in the quoted Specification passage." (Id. Ex. S at 9.)  According to the Majority, a recording of an entire game would render claim 23 obvious because the edited recording would "'consist essentially of' the last pitch thrown to each player and attempted base running activity."  (Id.)  In contrast, the majority allowed claim 24 because "even the prior art chose to exclude portions of the baseball game which would be required by claim 24.  Claim 24 expressly requires that 'unsuccessful attempts of the runner on base to advance to another base resulting in an out not associated with game action resulting from the final pitch' be included in the edited game video."  (Id. Ex. S at 11.)  Put simply, claim 24 requires including "uninteresting game elements," which the Majority found was not obvious.  (Id. Ex. S at 11-12.)  The Majority also "recognized[d] that this editing was clearly within the skill of the ordinary artisan."  (Id. Ex. S at 11.)

## II.   CLAIM TERMS OR PHRASES TO BE CONSTRUED

The parties have requested that the Court construe the following eight terms or phrases, and have provided the following proposed constructions for each term or phrase:

| CLAIM TERM NO. | DISPUTED CLAIM TERM/PHRASE | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 1 | A method of providing a subscription for viewing a recorded baseball game | This is not a claim limitation. | This is a claim limitation. |
| 2 | comprising | "Comprising" is an open-ended transitional phrase defined as 'including but not limited to.' | The method of "providing a subscription . . ." must include the recited method steps, but may include additional steps not otherwise excluded from or contradictory to those steps. For example, "playing" or "broadcasting" the "edited recording" for "subscribers" as defined is a recited step that cannot be eliminated by unrecited method steps. |
| 3 | edited recording | A game recording that excludes substantially all game action, but includes essentially all final pitches and attempts by base runners to advance on the bases not associated with a final pitch – e.g., base stealing attempts. | A recording edited to leave not only all (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base, but also may include optional material from the game recording including, but not limited to, original soundtrack recordings or narrative to explain play. |

| CLAIM TERM NO. | DISPUTED CLAIM TERM/PHRASE | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 4 | obtaining subscribers | "Subscribers:" Users that either agreed or requested in some manner to view the edited recording. | Obtaining viewers that either agreed or requested in some manner to view the edited recording. |
| 5 | condensed recorded game | The edited recording. | The edited recording (defined above) played or broadcasted to subscribers. |
| 6 | playing | Providing the edited recording for display. | Causing a device to display. |
| 7 | broadcasting | Providing the edited recording for display to multiple subscribers | Simultaneously sending in a one-way transmission to multiple recipients. |
| 8 | editing the game recording of each appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch | Baseball Quick objects to construing this lengthy and sweeping passage which combines numerous discrete elements and contends that the elements "edited recording" and "final pitch" should be construed separately as shown above. There is no prejudice to Advanced Media, as Baseball Quick's positions for the discrete elements are set forth above. Baseball Quick disputes any requirement that the "edited recording" includes all "final pitches" and all base running attempts not associated with the game action resulting from final pitches. | Editing the game recording of each appearance-at-bat by deletion to produce an edited recording that must include all: (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base. Optional material that may also remain in the edited recording as part of this process includes, but is not limited to, original soundtrack recordings or narrative to explain play. |

III.   LEGAL STANDARDS FOR CLAIM CONSTRUCTION

A.   Question of Law for the Court

Claim construction is a question of law for the Court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). Determining the meaning of terms within a claim assists a fact finder in making subsequent and ultimate decisions as to whether an invention has in fact been infringed, or is in fact valid.  In construing the meaning of a term, the issue is not what that term would mean to an average lay person, but what that term or phrase would have meant to one "of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (citations omitted).  A court's job is, then, to try and place itself in the position of one of ordinary skill in the art of the invention(s) at issue.

One skilled in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id.  The specification is the "single best guide to the meaning of a disputed term." Id. at 1315; see also On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1338, 1340 (Fed. Cir. 2006) ("[T]he scope and outer boundary of claims is set by the patentee's description of his invention," id. at 1338, and "the claims cannot be of broader scope than the invention that is set forth in the specification," id. at 1340.).  However, although specifications contain one or more examples of the embodiment of an invention, they

need not contain every possible embodiment.  Therefore, courts should not read into the claims limitations based on the embodiments in the specification.  See Phillips, 415 F.3d at 1323; see also Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1370 (Fed. Cir. 2008) ("[The defendant] argues that a patent can never be literally infringed by embodiments that did not exist at the time of filing.  Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough.").

    B.    Evidence Used in Claim Construction

    A court may use intrinsic—and, if necessary, extrinsic—evidence in construing claims.  See Nazomi Commc'ns, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1368 (Fed. Cir. 2005) (instructing courts to look to intrinsic evidence first). Intrinsic evidence includes the claims and specifications in the patent itself, as well as the patent's file history (or wrapper).  "Foremost among the tools of claim construction is of course the claim language itself, but other portions of the intrinsic evidence are clearly relevant, including the patent specification and prosecution history."  All Dental Prodx, LLC v. Advantage Dental Prods., Inc., 309 F.3d 774, 780 (Fed. Cir. 2002); see Phillips, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" (citing Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  In patents with multiple claims using similar terms, such as the patents-in-suit, it is well accepted that terms in a claim should be construed consistently across claims.  Southwall Techs.,

Inc. v. Cardinal IG Co., 54 F.3d 1570, 1579 (Fed. Cir. 1995) ("[C]laim terms must be interpreted consistently.").

Extrinsic evidence that courts may use includes dictionaries used by one of ordinary skill in the art, treatises, and expert testimony in the form of affidavits. Phillips, 415 F.3d at 1317.[4]

C.    The Preamble of a Patent

The preamble of a patent is generally not construed as a claim limitation. Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002). This general rule may be altered, however, when (1) the preamble "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim," Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002), quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999); or (2) there has been "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art," Catalina Mktg., 289 F.3d at 808, citing Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368, 1375 (Fed. Cir. 2001).

---

[4] The Federal Circuit directed that courts should use dictionaries when necessary and useful, but with appropriate caution. See Innogenetics, 512 F.3d at 1371 (citing Phillips, 415 F.3d at 1321, for its cautionary language regarding elevation of dictionaries "to such prominence that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim limitations").

IV.    STANDARD OF REVIEW ON SUMMARY JUDGMENT[5]

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23.  In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

---

[5] This is MLBAM's second motion for summary judgment that seeks, inter alia, the denial of provisional rights to BQ.  Its prior motion was brought before United States District Judge Thomas P. Griesa, to whom this case was assigned prior to its transfer to this Court on June 6, 2013.  In an Opinion dated March 30, 2012, Judge Griesa denied MLBAM's prior motion for summary judgment. Judge Griesa reasoned, in general terms, that the portions of the Patent and the 2003 Published Application "regarding subscribers are essentially synonymous," and that the addition of the description of "obtaining subscribers" to the Patent "does not involve anything approaching a difference of substance from the application." (3/30/12 Opinion at 10, ECF No. 85.)  BQ argues that this determination precludes an additional motion on the issue of provisional rights. (BQ SJ Opp. at 13-17, ECF No. 176.)  The Court disagrees.  "[B]ecause the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." Nabisco v. Warner-Lambert Co., 32 F. Supp. 2d 690, 694-95 (S.D.N.Y. 1999), aff'd, 220 F.3d 43 (2d Cir. 2000).  Further, there have been intervening developments since Judge Griesa's March 30, 2012 Opinion—further reexamination proceedings, a Markman hearing, additional claim construction submissions, and the Court's claim construction discussed herein.  In light of the fact that Judge Griesa did not grant summary judgment to either MLBAM or BQ on the issue of provisional rights, this issue remains open and must be decided by this Court.

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

V.    LEGAL STANDARDS GOVERNING PROVISIONAL RIGHTS

"Provisional rights" allow an inventor to recover royalties for infringing

conduct occurring during the period after publication of a patent application but

prior to the patent's issuance.  35 U.S.C. § 154(d).  Since provisional rights extend

back to the initial patent application, the statute requires that, for recovery, a

patent holder must demonstrate that "the invention as claimed in the patent is

substantially identical to the invention as claimed in the published patent

application."  Id. § 154(d)(2).[6]  As stated in the Congressional Record when the

provisional rights statute was enacted:

> To allow anything less than substantial identity would impose an
> unacceptable burden on the public.  If provisional rights were available
> in the situation where the only valid claim infringed first appeared in
> substantially that form in the granted patent, the public would have no
> guidance as to the specific behavior to avoid between publication and
> grant.

145 Cong. Rec. S14,696 at S14,719 (daily ed. Nov. 17, 1999) 145 Cong. Rec. H11,769

at H11,804 (daily ed. Nov. 9, 1999).

The "substantially identical" standard set forth in § 154(d)(2) was explicitly

based on the case law interpreting that phrase as used in 35 U.S.C. § 252, which

deals with royalties for the period between the date of issued claims and

reexamined claims.  See 21st Century Patent System Improvement Act, H.R. Rep.

No. 105-39, at 56 (Mar. 20, 1997).

---

[6] The provisional rights statute also requires that the infringing party have "had actual notice of the
published patent application."  35 U.S.C. § 154(d)(1)(B).  Though MLBAM does not concede that it
received the requisite notice, its motion for summary judgment as to provisional rights is not
directed at this issue.  (See MLBAM SJ Mem. of Law at 5 n.2, ECF No. 164.)

Claims are "identical" if they are without substantive change.  Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1346 (Fed. Cir. 1998) ("Laitram IV") (citing Seattle Box Co. v. Industrial Crating & Packing, 731 F.2d 818, 827-28 (Fed. Cir. 1984)). Substantial identity does not require literal sameness of words, but rather requires substantial identity in scope.  See Laitram IV, 163 F.3d at 1346; Bloom Eng'g Co. v. N. Am. Mfg. Co., 129 F.3d 1247, 1250 (Fed. Cir. 1997); Slimfold Mfg. Co. v. Kinkead Indus., Inc., 810 F.2d 1113, 1115 (Fed. Cir. 1987) ("'Identical' has consistently been interpreted as not excluding minor word changes.") (citation omitted); Kaufman Co. v. Lantech, Inc., 807 F.2d 970, 978 (Fed. Cir. 1986) (identical does not mean verbatim).  "An amendment that clarifies the text of the claim or makes it more definite without affecting its scope is generally viewed as identical for purposes of § 252."  Bloom, 129 F.3d at 1250.  Further, "[d]etermination of whether a claim change during reexamination is substantive requires analysis of the scope of the original and reexamined [or issued] claim in light of the specification, with occasion to the references that occasioned [or allowed] the reexamination [or issuance], as well as the prosecution history and any other relevant information."  Id.

In comparing the scope of original claims to those later issued, a court must be mindful not to import limitations appearing only in the specification.  Laitram, 163 F.3d at 1347 (citing Electro Med. Sys. v. Cooper Life, 34 F.3d 1048, 1054 (Fed. Cir. 1994)).  "It is the claims, not the written description, which define the scope of the patent right."  Laitram IV, 163 F.3d at 1347 (citing Novo Nordisk of N. Am. v. Genentech, Inc., 77 F.3d 1364, 1369 (Fed. Cir. 1996)).

In <u>Laitram IV</u>, the Federal Circuit agreed with NEC that the claims had been substantively changed—the original claims covered a printer or method of printing which generates "any" quality of characters, while the amended claims covered only a printing apparatus or method of printing which generates "type quality" of characters.  <u>Id.</u> at 1348.  The court noted that the addition of the "type quality" limitation, along with other amendments, resulted in the allowance of the claims over prior art and was therefore a "highly influential piece of prosecution history." <u>Id.</u>  While recognizing that there may be exceptions, the Court signaled a presumption that when an amendment has resulted in the allowance of claims in this manner, the claims will likely have been substantively changed.  <u>See</u> <u>id.</u>

In <u>Seattle Box</u>, the Federal Circuit found that the phrase "substantially equal to or greater than" was a substantive change from the limitation "greater than" in the original claim, and noted that the change was "not a matter of a mere clarification of language to make specific what was always implicit or inherent." 731 F.2d at 828; <u>see also</u> <u>Laitram Corp. v. NEC Corp.</u>, 952 F.2d 1357, 1360-61 (Fed. Cir. 1991) ("<u>Laitram I</u>").

Not every change or amendment made during prosecution results in an altered scope of a claim.  <u>See</u> <u>Kaufman</u>, 807 F.2d at 978; <u>see also</u> <u>Medisim Ltd. v. BestMed LLC</u>, 910 F. Supp. 2d 591, 620 (S.D.N.Y. 2012) (word changes made to reduce redundancy did not affect claim scope).

VI.    THE COURT'S CLAIM CONSTRUCTION

There is one essential dispute between the parties which permeates most of the debate regarding the proper construction of certain claims in the '716 Patent: whether the claimed invention requires the inclusion of each and every final pitch to each batter, or something less than that.  The remaining arguments, including whether the preamble constitutes a claim limitation, are secondary to this overarching issue.

As set forth below, the claims, read in the context of the specification and amply confirmed by the prosecution history, leave no doubt that the claimed invention approved by the PTO was for an edited recording that included each final pitch to a batter for each at bat.  The scope of the Patent is, therefore, narrower than plaintiff urges.  Plaintiff's proposed constructions would result in the scope of the invention returning to that which was disallowed—an edited recording that could have something less than all final pitches to a batter for each at bat, and something less than the resulting game action—rendering it virtually indistinguishable from a highlight tape.  As is clear from the prosecution history described supra, highlight tapes were well-represented in the prior art at the time of patent issuance, and plaintiff spent several years convincing the PTO that its claimed invention was not that.

A.    Claim Term 1: The Preamble

The first question for the Court is whether the preamble, which refers to "A method of providing a subscription for viewing a recorded baseball game"

25

constitutes a claim limitation. Plaintiff argues "no," defendant argues "yes." (Claim Constr. Chart at 1, ECF No. 151.)

Though preambles are generally not claim limitations, they may serve as a limitation if a plaintiff expressly relied on the preamble in order to obtain claim allowance, or if the preamble gives life and meaning to a claim. Catalina Mktg., 289 F.3d at 808-09.

The preamble in Patent Claim 1 is essential to each of the claims in the Patent. As noted supra, Patent Claim 1 is the sole independent claim in the Patent; each of Patent Claims 2-5 are dependent on claim 1. Patent Claim 1 describes a method patent; the referenced language from the preamble provides the reader with notice as to what kind of method the Claim discloses. Given this use of the preamble, it constitutes a claim limitation. See Pitney Bowes, 182 F.3d at 1305.

In addition, plaintiff expressly relied on the preamble in its Pre-Review Appeal Brief. There, in an effort to distinguish the invention from the prior art, plaintiff relied on language taken only and directly from the preamble. The preamble in Patent Claim 1 refers to "[a] method of providing a subscription for viewing a recorded baseball game." (Pak Decl. Ex. A, Col. 3, lines 21-22.) In its Pre-Review Appeal Brief, plaintiff argues that HistoricFilms is not "A method of providing a subscription for viewing a recorded baseball game (claim 24)." (Franecki Decl. Ex. K at 2 n.1.) Claim 24 became Patent Claim 1. There is no other source for this argument other than the preamble to Patent Claim 1. While the word "subscription" does appear once in the specification, the context in which it

appears is unrelated: "The completed (edited) version can be sold on a per-game basis, i.e., through cable subscription arrangement, or delivered digitally over the Internet to subscribers . . . ." (Pak Decl. Ex. A, Col. 2, lines 40-41.)  Accordingly, the preamble to Patent Claim 1 serves as a claim limitation.

      B.     <u>Claim Term 2:  "Comprising"</u>

The parties do not disagree that, as a matter of law, the term "comprising" has long been construed as meaning "that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." <u>Genentech, Inc. v. Chiron Corp.</u>, 112 F.3d 495, 501 (Fed. Cir. 1997); <u>see also</u> <u>Invitrogen Corp. v. Biocrest Mfg., L.P.</u>, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."). The debate here ultimately returns to claim scope— has plaintiff conceded that an "edited recording" within the meaning of the claims consists of certain game action that it now urges may be deleted? (<u>See</u> Claim Constr. Chart at 1.)

In this regard, plaintiff urges that the term "comprising" is an open-ended transitional phrase that means "including but not limited to," and in particular, that it allows for additional deletion steps. (<u>See id.</u>; BQ Supp. Claim Constr. Br. at 12-13, ECF No. 152.) Bluntly put, plaintiff asserts that "comprising" refers not to inclusion, but deletion.  This is incorrect.

As an initial matter, a plain reading of the claim language itself fails to support plaintiff's assertion.  The claim language clearly uses the term "comprising"

as it was intended to be used: as a list of steps which may be included in the method, while leaving open the possibility that other steps may also occur.  There is nothing about the use of the term "comprising" in Patent Claim 1 which suggests that the deletion step, which is set forth in some detail in step 2 and subparts (i) through (iii), was itself incomplete.

In addition, the specification and prosecution history leave no doubt that the invention required the inclusion of certain game action, including all final pitches to every batter for each at bat.  Indeed, those words were used repeatedly throughout the prosecution history.  (See Franecki Decl. Exs. D at 10, I at 7-8, 11, K at 4-5, N at 8-9, 11-12, O at 2, P at 11, 33, R at 7-8.)  Plaintiff's proposed construction of the word "comprising" would broaden that which it committed during the prosecution history to narrow.  See Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1380 (Fed. Cir. 1998) ("'Comprising' is not a weasel word with which to abrogate claim limitations.").  To the extent there was any room in the term "comprising" to allow for additional deletions beyond those specified in step 2, plaintiff specifically and repeatedly excluded those during the prosecution history.  This is precisely what occurred in Dippin' Dots, Inc. v. Mosey, and which led to the Federal Circuit's determination that while "beads" might generally have shapes other than spherical, the patentee had narrowed the definition during prosecution.  476 F.3d 1337, 1343 (Fed. Cir. 2007).  Here, for instance, in attempting and then succeeding in overcoming prior art that contained methods consisting of less than all final pitches, plaintiff argued that its process was "objective" and that all final pitches were

28

"required" (Franecki Decl. Exs. D at 8, 10, I at 12-13, K at 4, N at 8-9, R at 2, 4-5), and that even boring elements were required to be included if those elements were part of the retained game action (id. Exs. K at 4, N at 12). Plaintiff even called its invention an "algorithm" and stated that for a nine-inning game, "at least" 54 pitches would be included. (Id. Ex. N at 12.) In the absence of the inclusion of these game elements, the invention becomes indistinguishable from a highlight tape, which plaintiff has repeatedly and vigorously urged that it is not.

In support of its construction of comprising as allowing additional—and therefore necessarily subjective—deletions, plaintiff argued at the Markman hearing the Court held on May 29, 2014 that editing is "subjective by definition." (See 5/29/14 BQ Presentation at 30-32, ECF No. 175-1.) This argument flatly contradicts plaintiff's repeated statements that the invention claimed an objective method, not a subjective one.[7]

Accordingly, the Court construes the term "comprising" as used in Patent Claim 1 in the manner proposed by defendant—conveying that the enumerated method steps shall be included, but that additional and non-contradictory steps may be included as well.

---

[7] To the extent plaintiff relies on statements made by PTO Examiner Cameron Sadat during reexamination of the Patent regarding claim 24 (see Pak Decl. Ex. H), such reliance is misplaced. For instance, in his January 17, 2014 decision, Examiner Sadat explains that while deletions leaving the required game action occur by way of an objective process under the method, there is also a subjective component in the step allowing for the inclusion of additional material. (Id. Ex. H at 8.)

C.    Claim Term 3: "Edited Recording"

The parties' dispute with respect to the phrase "edited recording" is a reprise

of their dispute with respect to "comprising."  Plaintiff argues that an edited

recording need not include all final pitches for each at bat or attempts to advance on

the bases not associated with a final pitch (e.g., base stealing attempts).  (See Claim

Constr. Chart at 1.)  Defendant urges that it must, but that an edited recording can

also include additional optional material.  (See id.)

For the reasons set forth above, the Court agrees with defendant's proposed

construction; on its face, the term "edited recording," used in all claims, describes an

edited recording that includes all—not just some, not just those which an editor

subjectively defines as interesting—final pitches and attempts to advance.  See

Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (stating that

courts look to the "words of the claims themselves . . . to define the scope of the

patented invention").  This construction is consistent with the plain language of the

claims themselves, the specification, and the many statements by plaintiff about the

invention during the Patent's prosecution.[8]  See Phillips, 415 F.3d at 1316 ("The

construction that stays true to the claim language and most naturally aligns with

the patent's description of the invention will be, in the end, the correct

construction.") (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d

1243, 1250 (Fed Cir. 1998)).

---

[8] During prosecution, plaintiff removed language from claim 23 that suggested that the edited
recording could include only a portion of an entire game.  (See Franecki Decl. Ex. I at 2.)
Subsequently, plaintiff cancelled dependant claims 26 and 31, which each also suggested that the
edited recording "comprises only a portion of a nine-inning baseball game."  (See id.; id. Ex. N at 3.)

Further support for this construction is found in step 2 of Patent Claim 1, which describes the "production" of the edited recording through deletion of "substantially all game action other than" game action associated with the final pitch to each batter, as well as successful and unsuccessful attempts to advance to another base not associated with final pitches.  (Pak Decl. Ex. A., Col. 4, lines 3-11.) The specification discusses this step in additional detail, stating that the tape is edited down "to retain the last pitch thrown to each player, plus any resulting action for that pitch."  (Id. Ex. A, Col. 2, lines 10-14.)

    D.    Claim Term 4: "Obtaining Subscribers"

The Patent Claims all relate to an edited recording that is ultimately played or broadcasted for viewing by "subscribers."  The parties disagree as to whether "subscribers" are "users" (plaintiff's preferred construction) or "viewers" (defendant's proposed construction) or "subscriber-viewers."  (See Claim Constr. Chart at 1.)

The Court adopts a construction of this term as including both subscribing and viewing and therefore as "subscriber-viewers."  The preamble to Patent Claim 1 describes the invention as "[a] method of providing a subscription for <u>viewing</u> a recorded baseball game."  (Pak Decl. Ex. A, Col. 3, lines 21-22 (emphasis added).) Step 3 in Patent Claim 1 refers to "obtaining subscribers for <u>viewing</u> the edited recording."  (Id. Ex. A, Col. 4, lines 11-12 (emphasis added).)  Step 4 in Patent Claim 1 refers to playing or broadcasting the edited recording "for <u>viewing</u> by the subscribers."  (Id. Ex. A, Col. 4, lines 12-14 (emphasis added).)  Similarly, Patent

Claims 3 and 4 both refer to playing or broadcasting the edited recording "for

viewing." (Id. Ex. A, Col. 4, lines 17-22 (emphasis added).) This construction is also

consistent with the specification, which describes releasing the edited recording to

"its viewership." (Id. Ex. A, Col. 2, lines 45-48 (emphasis added).)

Plaintiff's proposed construction—defining subscribers as "users"—seeks to

distance the act of viewing the edited recording from the subscriber. This distance

is not supported by the intrinsic evidence. The Patent discloses a method of

producing an edited recording of a baseball game that will, in some fashion, be

viewed by subscribers. A plain reading of the claim language therefore supports the

construction of "subscribers" as "subscriber-viewers." This does not mean that

subscribers cannot also be "users" of an Internet service, but they must be viewers

as well. The only role for the subscribers is to view; and, according to the Patent,

the edited recording is created for that specific purpose.

E.   Claim Term 5: "Condensed Recorded Game"

The parties agree that a "condensed recorded game" is, at a minimum, the

edited recording. (See Claim Constr. Chart at 2.) Defendant proposes that the

Court also require that the condensed recorded game be "played or broadcasted to

subscribers." (Id.) The Court finds this addition to be contrary to the plain

language of the Patent.

Step 4 of Patent Claim 1 refers to "playing or broadcasting the edited

recording as a condensed recorded game for viewing by the subscribers." (Pak Decl.

Ex. A, Col. 4, lines 12-14.) Though MLBAM is correct that the phrase "condensed

recorded game" only appears in this "playing or broadcasting" step, the inclusion of this same language again in its proposed construction of the phrase itself creates redundancy and is unnecessary.[9]

    F.    <u>Claim Terms 6 and 7: "Playing" and "Broadcasting"</u>

    Plaintiff's proposed construction for the terms "playing" and "broadcasting" seeks to interpose an intermediate step unsupported by the intrinsic evidence. Plaintiff urges that "playing or broadcasting the edited recording for viewing" is something other than "playing or broadcasting"—plaintiff argues, instead, that it should also encompass "providing" the recording for display. (<u>See</u> Claim Constr. Chart at 2.) The Court rejects this argument, and adopts the more natural proposed constructions for these terms offered by defendant.

    "Playing" and "broadcasting" are not defined in the Patent Claims or the specification as having any special meaning. <u>See</u> <u>CCS Fitness, Inc. v. Brunswick Corp.</u>, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (noting that a "claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history"). The Court gives these terms their plain and ordinary meaning. <u>See</u>, <u>e.g.</u>, <u>Phillips</u>, 415 F.3d at 1312. They are both used in an active and direct sense: the act of playing, and the act of broadcasting. In that regard,

---

[9] In light of the fact that the Court construes the "edited recording" in the manner proposed by defendant, there does not appear to be any remaining dispute as to the construction of the "condensed recorded game." (<u>See</u> 5/29/14 Tr. at 63-64, ECF No. 186 ("MS. RIGSBY: . . . But if the edited recording is construed as we believe it should be, then I agree, there is really nothing to add [to the construction of condensed recorded game].").)

"playing the edited recording" means causing a device to display it; "broadcasting the edited recording" means sending a simultaneous transmission to subscribers who may view the recording upon receipt. (See Franecki Decl. Exs. I, J.)

> G.    Claim Term 8: The Editing Step

Defendant requests that this Court construe the editing step—step 2 of Patent Claim 1—while plaintiff argues that this step contains "numerous discrete elements" that should be construed separately. (See Claim Constr. Chart at 2.) The law is clear that "[p]roper claim construction, however, demands interpretation of the entire claim in context, not just part of the claim language." Wechsler v. Mack Int'l Trade, Inc., 56 F. App'x 935, 940 (Fed. Cir. 2003) (citing Hockerson-Halberstadt, Inc. v. Converse Inc., 183 F.3d 1369, 1374 (Fed. Cir. 1999)). The scope and meaning of a claim is a legal question for the Court to decide. E.g., Boss Control, Inc. v. Bombardier Inc., 410 F.3d 1372, 1376 (Fed. Cir. 2005).

The various constructions set forth above resolve the dispute as to the editing step. For these reasons, the Court finds that the editing step requires producing an edited recording that retains: (1) game action resulting from a final pitch thrown to each player for each at bat; and (2) all successful and unsuccessful attempts of runners on base to advance to another base not otherwise associated with game action resulting from a final pitch. The editing step also permits additional optional material to remain in the edited recording, such as showing a young fan, a coach's signals, a narrative to explain play, or original soundtrack recordings. This construction is again supported by a plain reading of the claim language, the

34

specification, and the prosecution history. (See Pak Decl. Ex. A, Col. 2, lines 10-14, Col. 4, lines 3-11; Section I.B ("Prosecution History"), supra.)

VII.  ANALYSIS OF PROVISIONAL RIGHTS

As set forth above,[10] the 2003 Published Application was published on March 27, 2003; after more than six and a half additional years of prosecution, the Patent was issued in its final form on December 8, 2009. (Pak Decl. Exs. A, B.) In its complaint, plaintiff seeks damages for infringement relating to two time periods—the period after publication but prior to issuance of the '716 Patent (March 27, 2003 through December 7, 2009), and then from issuance (December 8, 2009) to the present. Defendant's motion for summary judgment on provisional rights relates to the first period. (See MLBAM SJ Mem. of Law at 4 n.1, ECF No. 164.) If defendant is found to have infringed the Patent, BQ may be entitled to damages for this period, during which it had only "provisional" rights, if it is able to meet its burden of proving that its claims in the 2003 Published Application were "substantially identical" to those in the Patent as issued. See 35 U.S.C. § 154(d)(2). Defendant has moved for summary judgment as to this second issue—substantial identicality—only. (See MLBAM SJ Mem. of Law at 3.)

Defendant argues that the Patent Claims are substantively different from Application Claims in three ways: (A) the inclusion of the word "substantially" in

---

[10] In support of and in opposition to defendant's motion for summary judgment on provisional rights, the parties submitted statements pursuant to Local Rule 56.1. (See ECF Nos. 166, 177, 182.) Though the Court has reviewed these statements, its cites herein to the '716 Patent and the 2003 Published Application directly because the substantive differences between the claims in each are clear on their face.

Patent Claim 1, which was added as part of the August 2003 amendments (see

Franecki Decl. Ex. D at 8); (B) the inclusion of the "obtaining subscribers" step in

Patent Claim 1, which was added as part of the February 2004 amendments (see id.

Ex. E at 4-6); and (C) the inclusion of the words "play" and "broadcast" in Patent

Claims 1 and 3, which replaced the word "present" in Application Claims 4 and 8 as

part of the August 2003 (id. Ex. D at 3-4).  (See MLBAM SJ Mem. of Law at 14-25.)

     There is no dispute that these changes were made.  There is also no dispute

that plaintiff has the burden of proof as to substantial identicality.[11]  (See BQ SJ

Opp. at 8, ECF No. 176.)  The question, however, is whether there is a material

issue of fact as to whether these changes simply clarified that which was previously

inherent in the Application Claims, and therefore whether the scope of the

Application Claims was unchanged following these pre-issuance amendments.  The

answer is no.  Accordingly, defendant's motion for summary judgment on

provisional rights is GRANTED.

---

[11] At least one out-of-Circuit district court has explicitly stated that "[i]t is Plaintiffs' burden, as the party seeking damages, to prove the claims are substantially identical." Loops, LLC v. Phoenix Trading Inc., No. C08-1064 RSM, 2010 WL 3041866, at *5 (W.D. Wash. July 30, 2010).

Overview

The differences between the Application and Patent
Claims are reflected in the redline, below.

---

**Redline (with deleted language in red strike through and added language in green italics)**

4. *1.* A method of ~~recording and editing a~~ *providing a subscription for viewing a recorded* baseball game in which players from each ~~side~~ *team* appear at bat, ~~in turn,~~ and attempt to place a pitched baseball into play and *to* reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method comprising:  *(1)* recording ~~the~~ *each* appearances-at-bat for ~~each~~ *every* player~~, in turn, plus other~~ *and game* action *resulting from an* ~~that ensues during or after~~ the appearances-at-bat *to produce a game recording, (2)* editing the *game recording of each* ~~recorded~~ appearances-at-bat to ~~leave only~~ *produce an edited recording by deleting substantially all game action other than (i) game action from a final* ~~the last~~ pitch thrown to each player~~, plus any action ensuing after that pitch~~ *(ii) successful* ~~and any~~ attempts of runners on base to advance to another base *not associated with the game action result from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base, resulting in and out not associated with the game action result from the final pitch, (3) obtaining subscribers for viewing the edited recording;* and *(4)* presenting *playing of broadcasting* the edited ~~recorded game~~ *recording* as a condensed recorded game ~~showing important action portions of the game~~ *for viewing by the subscribers.*

~~2.~~ *3.* The method ~~according to~~ *of* claim 4 *1* wherein said step of ~~presenting~~ *playing or broadcasting* the edited ~~game as a condensed recorded game~~ *edited recording for viewing* ~~includes delivering the recorded game to subscribers~~ *is conducted* over the Internet.

---

(See 6/26/14 MLBAM Presentation at 12, ECF No. 188-3.)

    A.    Inclusion of "Substantially"

Application Claim 4 is closest to the claim that became Patent Claim 1.  In

Application Claim 4, the method of producing the edited recording included the

following step 2: "editing the recorded appearances-at-bat <u>to leave only</u> the last

pitch thrown to each player, plus any action ensuing after that pitch and any

attempts of runners on base to advance to another base . . . ."  (Pak Decl. Ex. B at 1

(emphasis added).)  As issued, step 2 of Patent Claim 1 provides: "editing the game

recording of each appearance-at-bat to produce an edited recording <u>by deleting</u>

<u>substantially all</u> game action other than (i) game action from a final pitch thrown to

each player, (ii) successful attempts of runners on base to advance to another base

not associated with the game action resulting from the final pitch and (iii)

unsuccessful attempts of the runners on base to advance to another base resulting

in and [sic] out not associated with the game action resulting from the final pitch . .

. ." (Id. Ex. A, Col. 4, lines 4-11 (emphasis added).)

Defendant asserts that the deletion of the phrase "leave only" and inclusion

of the phrase "by deleting substantially all" broadens—and thereby alters—the

scope of the claim. The Court agrees. The issue is not, as plaintiff urges, simply a

non-substantive word change, which would not defeat identicality under Laitram I

or Seattle Box. This change to the claim language both alters and broadens the

scope of the invention.

In Application Claim 4, the phrase "leave only" provides distinct boundaries

as to the content that may be retained in the edited recording. The retained content

must be, and can be no more than, what follows in step 2: the final pitch for each

player's at-bat(s) and resulting game action, as well any attempts to advance not

associated with those final pitches. Put another way, an edited recording which

retained more than such material could not infringe on Application Claim 4.

In contrast, step 2 of Patent Claim 1 allows for deletions of content that

retain final pitches and attempts to advance, as well as additional content. This

additional content was described during prosecution history as non-game action

material such as showing a young fan, showing a coach's signals to players, and

other narrative. Thus, inclusion of such material in an edited recording would have

38

defeated a claim for infringement under the 2003 Published Application whereas, under the Patent, it would not.

The substantive nature of this difference between the Application Claims and the Patent Claims is further confirmed by the ongoing reexamination proceedings. Earlier this year, Examiner Saadat stated that he "agrees with patent owner that the claim term 'substantially' cannot be ignored." (Pak Decl. Ex. H at 6.)

Plaintiff now argues that inclusion of "substantially" and removal of "leave only" is simply a clarification. According to plaintiff, both "deleting substantially all" and "leave only" refer to the allowance of additional deletions. In other words, plaintiff argues that deleting substantially all game action other than the enumerated items in step 2 is not inconsistent with eliminating some portion of those enumerated items; the focus here is on "substantially" constituting less than "all." Similarly, according to plaintiff, "leave only" is not inconsistent with "leave only "x" type of material, but you need not leave all of "x" type of material available. In both cases, plaintiff argues that the type of material set forth in the following numerettes in step 2 may itself be subject to some deletion.

Plaintiff's argument ignores the key phrase "other than," which follows the phrase "deleting substantially all game action" and is read in its entirety as: "to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player . . . ." The inclusion of "other than" precludes plaintiff's proposed reading of step 2 of Patent Claim 1. "Other than" clearly and unambiguously refers to deletions, set forth in numerrettes (i), (ii),

and (iii), which must occur. "Deleting substantially all," therefore, refers to the deletion of some, but not all, of the additional material in the recording other than that described in the three numerettes.

Plaintiff proffered a pictorial example of the similarity between "leaving only" and "deleting substantially all."



(See 6/26/14 BQ Presentation at 21, ECF No. 188-1.)

According to plaintiff, if one assumes that a full water glass constitutes a complete game recording, and the edited recording is created by pouring water from the first glass into the bottom-third of a second, empty glass, this bottom-third of liquid is what was "left" after the deletions; and that the empty two-thirds of the glass constitutes the deletion of "substantially all" other game action.

Using the glass example, the Court's view is that "leave only" means that the water level in the second glass is certain and determinate, whereas "delete substantially all" permits the water level to be variable depending on the amount of additional material the editor has decided to include.

40



The Court's view is confirmed by the prosecution history. During the oral argument before the Board of Patent Appeals, counsel for plaintiff confirmed that the items in the numerettes contained in step 2 were required, referring to the fact that unsuccessful pick-off plays have to be part of the edited recording. (Franecki Decl. Ex. R at 4 ("So they cut out a pick-off play. That has to be part of our recording.").) Plaintiff also represented to the Board that in, contrast to plaintiff's invention, prior art does not show "every routine ground out, every routine fly out, every, however it takes place." (Id. Ex. R at 8.)

In its August 3, 2009 decision, the Majority found that while prior art "chose to exclude portions of the baseball game which would be required by claim 24 [which became Patent Claim 1]," "[c]laim 24 expressly requires that 'unsuccessful attempts of the runners on base to advance to another base resulting in an out not associated with the game action resulting from the final pitch' be included in the

41

edited recording." (Id. Ex. S at 11.) In allowing claim 24, the Majority also

specifically relied upon the fact that the claim "requires inclusion of uninteresting

game elements such as a quick three out inning with three ground outs to second

base. Consequently, there is no reason for the creative person of ordinary skill to

have edited a baseball game as required by claim 24 to shorten the game but

include boring game elements." (Id. (emphasis added).)

    During reexamination, plaintiff has argued that "[n]one of [the prior art

references] will show all of the claimed criteria, in the manner claimed, including

the 'boring' elements." (Pak Decl. Ex. F at 22.) Plaintiff has also specifically

distinguished one piece of prior art, Mariners Fast Forward, as allowing for less

than all final pitches to be included, in contrast to its invention, which "required"

the inclusion of all final pitches. (Id. Ex. E at 13.)

    B.    Inclusion of "Obtaining Subscribers

    Application Claim 4 consists of two steps: recording and editing. Application

Claim 4 was the sole independent claim of the 2003 Published Application, as is

Patent Claim 1 in the Patent. Application Claim 8 claimed a method "according to

claim 4 wherein said step of presenting the edited game as a condensed recorded

game includes delivering the recorded game to subscribers over the Internet."

Claim 8 is, on its face, a dependent claim. It is the only reference to subscribers in

the 2003 Published Application.

    In contrast, Patent Claim 1 includes a recording step, an editing step, an

obtaining subscribers step, and a playing or broadcasting step. The addition of the

42

obtaining subscribers step narrowed thus the scope of Patent Claim 1 as compared to Application Claims 4 and 8. See Laitram IV, 163 F.3d at 1348 (original and amended claims substantively changed where "the original claims appear to cover a printer or method of printing which generates any quality of alphanumeric characters, while the amended claims seem to cover only a printing apparatus or method of printing which generates 'type quality' alphanumeric characters").

Defendant argues that the "obtaining subscribers" step in Patent Claim 1 marks a clear difference in the scope of Application Claim 4. This Court agrees. There is simply no way to read Application Claim 4 against Patent Claim 1 so that the two claims have substantially identical scope. Application Claim 4 does not require that any subscribers be obtained at all; thus, it would permit a claim of infringement in the absence of any subscribers. This is clearly not the case with respect to Patent Claim 1. Because a claim for infringement requires that an infringer violate each of the claimed steps in a method patent, the failure to "obtain subscribers" would preclude an infringement claim as to Patent Claim 1 but would not as to Application Claim 4. See Limelight Networks, Inc. v. Akamai Technologies, Inc., 134 S. Ct. 2111, 2117 (2014) ("A method patent claims a number of steps; under this Court's case law, the patent is not infringed unless all the steps are carried out.") This is the essence of a difference in scope.

Further, in its original claim construction briefing before Judge Griesa, plaintiff acknowledged that the preamble of the temporarily allowed claims (which included the 2003 Published Application) "did not include the 'providing a

43

subscription' element"; rather, "[t]he claims were allowed because the claim body of each of the allowed claims included the step of 'obtaining subscribers for viewing the edited recording' which was not found in the prior art."  (BQ Responsive Claim Constr. Br. At 30, ECF No. 100.)  This statement is consistent with the PTO's Reasons for Allowance dated February 24, 2004, which stated that "[t]he prior art does not show or suggest a method of replaying a baseball game which includes obtaining subscribers."  (2/24/04 Notice of Allowance at 2, ECF No. 94-5.)

    C.    <u>Change from "Presenting" to "Playing" or "Broadcasting"</u>

    Application Claim 4 included a step of "presenting" the edited recorded game. That step was altered in claim 24 (which became Patent Claim 1) so that the step referenced "playing or broadcasting the edited recording."  The question for this Court is whether this change resulted in an alteration of the scope of the claims. The Court finds that it does.

    In contrast, "to broadcast" something may be narrower than "presenting" it. Yet, though "playing" encompasses "broadcasting," that difference does not signal a change of scope.  Rather, the Court finds that using the words "playing" and "broadcasting" clarifies the term "presenting."

    There is a good argument that "playing or broadcasting" simply clarifies the word "presenting", the claims themselves treat the terms as different.  For "playing" to have the breadth that plaintiff argues would require that all manner of showing or presenting the recording would be encompassed; in this way, playing would equate with presenting.  This is in tension with dependent Patent Claim 3,

however.  Patent Claim 3 claims the method of Patent Claim 1—and is thus additive to, and not co-extensive with, Patent Claim 1—"wherein said step of playing or broadcasting the edited recording for viewing is conducted over the Internet."[12]  Patent law requires that courts construe claims to preserve their validity.  Phillips, 415 F.3d at 1328.  Thus, if this Court were to construe "playing or broadcasting" in Patent Claim 3 as equivalent to "presenting," there would be no difference between the scope of Patent Claim 3 and Patent Claim 1—thereby invalidating Patent Claim 3.  This would violate basic principles of patent law.

For all of the reasons set forth above, the Court finds that the scope of the claims in the 2003 Published Application are not substantially identical to those in the Patent.  Accordingly, plaintiff fails to meet its burden of proof as to any such provisional rights, and the Court grants defendant's motion for summary judgment on this issue.

---

[12] This language contrasts with Application Claim 8, in which "presenting" the recording "includes delivering" the recording over the Internet.  Application Claim 8, therefore, has an additional "providing" step that Patent Claim 3 does not.

## VIII.  CONCLUSION

For the reasons set forth above, the eight disputed claim terms and phrases

in the '716 Patent are construed as follows:

| CLAIM TERM NO. | DISPUTED CLAIM TERM/PHRASE | COURT'S CONSTRUCTION |
| --- | --- | --- |
| 1 | A method of providing a subscription for viewing a recorded baseball game | This is a claim limitation. |
| 2 | comprising | The method of "providing a subscription . . ." must include the recited method steps, but may include additional steps not otherwise excluded from or contradictory to those steps.  For example, "playing" or "broadcasting" the "edited recording" for "subscribers" as defined is a recited step that cannot be eliminated by unrecited method steps. |
| 3 | edited recording | A recording edited to leave not only all (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base, but also may include optional material from the game recording including, but not limited to, original soundtrack recordings or narrative to explain play. |
| 4 | obtaining subscribers | Obtaining viewers that either agreed or requested in some manner to view the edited recording. |
| 5 | condensed recorded game | The edited recording. |
| 6 | playing | Causing a device to display. |
| 7 | broadcasting | Simultaneously sending in a one-way transmission to multiple recipients. |

46

| CLAIM TERM NO. | DISPUTED CLAIM TERM/PHRASE | COURT'S CONSTRUCTION |
|---|---|---|
| 8 | editing the game recording of each appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch | Editing the game recording of each appearance-at-bat by deletion to produce an edited recording that must include all: (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base. Optional material that may also remain in the edited recording as part of this process includes, but is not limited to, original soundtrack recordings or narrative to explain play. |

In addition, defendant's motion for partial summary judgment on provisional rights is GRANTED.

The Clerk of Court is directed to close the motion at ECF No. 163.

SO ORDERED.

Dated:     New York, New York
           July 25, 2014

                                        K. B. Forrest
                                 _____
                                 KATHERINE B. FORREST
                                 United States District Judge