USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: DEC 0 4 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------- X
                     :
BASEBALL QUICK, LLC,              :
                     :
          Plaintiff,       :
                     :
     -v-                 :
                     :     11-cv-1735 (KBF)
                     :
MLB ADVANCED MEDIA L.P.,      :     OPINION & ORDER
                     :
          Defendant.     :
                     :
--------------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

      Defendant MLB Advanced Media, L.P. ("MLBAM") has brought this motion

for summary judgment of non-infringement against plaintiff Baseball Quick, LLC

("Baseball Quick" or "BQ"), which brought this suit against MLBAM alleging

infringement of U.S. Patent 7,628,716 ("the '716 Patent"). Both BQ and MLBAM

produce condensed versions of baseball games that can be streamed over the

internet. The '716 Patent describes a particular method for producing such a

condensed game.

      As the old saying goes, there is more than one way to skin a cat. Because

MLBAM uses a subjective editing process focused on copying and pasting material,

whereas BQ's is objective and focused on deleting material, MLBAM does not use

the method described by the '716 Patent, nor does it use an equivalent method.

Accordingly, the Court GRANTS summary judgment of non-infringement for

MLBAM.

I.     BACKGROUND

A.     Factual Background[1]

On June 13, 2000, BQ[2] filed a provisional patent application for what later

became the '716 Patent.[3]  At numerous points in the application process, BQ

described its claimed invention as an "objective" algorithm or method for producing

a condensed version of a professional baseball game.  (DSOF ¶¶ 130, 133, 135-37,

139, 147-50.)  The '716 Patent, which is entitled "Method of Recording and Playing

Baseball Game Showing Each Batter's Last Pitch," issued on December 8, 2009.

(ECF No. 1 ex. A ("'716 Patent.").)  It has five numbered claims:

> 1. A method of providing a subscription for viewing a
> recorded baseball game in which players from each team
> appear at bat, and attempt to place a pitched baseball
> into play and to reach base safely; with players failing to
> reach base safely being out and players on base
> attempting unsuccessfully to advance to another base
> being out; the method comprising: (1) recording each
> appearance-at-bat for every player and game action
> resulting from an appearance-at-bat to produce a game
> recording; (2) editing the game recording of each

---

[1] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in
connection with this motion for summary judgment and their supporting materials.  (ECF Nos. 201
("DSOF"), 211 ("PSOF" for responses; "PSOAF" for additional statements of fact), 218 ("DRSOF" for
objections to responses; "DRSOAF" for responses to additional statements of fact).)  The Court cites
to the parties' factual submissions only when they support a factual proposition, cite relevant
material, and are not contradicted in pertinent part by a counter-statement supported by citation to
evidence that would be admissible.  See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse
Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1
statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was
"deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any
evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004).  The Court generally recites only those facts
relevant to the claims and defenses at issue, but also includes some factual allegations that are not
material to the claims asserted but that are important to understanding the context for this case.

[2] The inventors listed on the patent are George M. Mockry and Greg M. Mockry.  (ECF No. 1 ex. A.)
Greg Mockry is a co-founder of BQ.  (PSOAF ¶ 1.)

[3] The history of the '716 Patent is set forth in greater detail and with full citations in the Court's July
25, 2014 Opinion & Order.  (ECF No. 194 ("Markman Op.") at 2-14.)

appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch; (3) obtaining subscribers for viewing the edited recording and (4) playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers.

2. The method of claim 1 wherein the edited recording for a nine-inning baseball game is about 15 minutes.

3. The method of claim 1 wherein said step of playing or broadcasting the edited recording for viewing is conducted over the Internet.

4. The method of claim 1 wherein said step of playing or broadcasting the edited recording for viewing is conducted by playing a videotape recording.

5. The method of claim 1 wherein the edited recording contains audio explaining any substitution of players.

('716 Patent ll. 3:21-4:24.)

As can be gleaned from the text of the patent, Claim 1 is an independent claim with four numbered steps, and the remaining four claims are dependent. (See '716 Patent ll. 3:21-4:24.) Claim 1 Step 2 requires the production of "edited recording[s]" that retain "game action from a final pitch thrown to each player and all "attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch." ('716 Patent ll. 4:3-11.). It also permits the inclusion of "additional material," such as "portions of an original soundtrack recorded by the announcers at the game or other added narrative," in order to

3

"explain pitching changes, pinch runners, and other substitutions that may affect play, as well as other aspects of the recorded action." (See '716 Patent ll. 2:34-39.) This optional material must be "from the game recording," and may include "original soundtrack recordings or narrative to explain play." (Markman Op. at 46.)

Claim 1 Step 4 provides that the "edited recordings" are "play[ed]" or "broadcast[]" for viewing by "subscribers," ('716 Patent ll. 4:20-22), who are "subscriber-viewers" that "either agreed or requested in some manner to view the edited recording," (Markman Op. at 31, 46). "Playing" the edited recording means causing a device to display it, and "broadcasting" the edited recording means simultaneously sending it in a one-way transmission to multiple recipients. (Markman Op. at 46.)

Like BQ, MLBAM also produces condensed versions of professional baseball games, which it calls "Condensed Games." (DSOF ¶¶ 4, 6.) MLBAM's editors build Condensed Games from telecast feeds, (see DSOF ¶ 25), generally by identifying and copying clips from the game telecast and placing those clips on a timeline, (DSOF ¶ 79; see DSOF ¶ 25).[4] The editors typically assemble the Condensed Game as the baseball game is being played. (DSOF ¶ 79.) Other graphical material, which may include graphical overlays and advertisements, is added later on.

---

[4] In a declaration, MLBAM's Executive Vice President of Content, Dinn Mann, stated that in connection with this litigation, a team of MLBAM editors was tasked with reviewing every Condensed Game since the end of the 2009 MLB season and noting every instance in which an entire at-bat was "deleted." (ECF NO. 74 ¶¶ 6-9 & ex. A.) BQ urges this Court to construe these statements as an admission by MLBAM that its editing method was based in part on deletion. The Court declines to do so. Mann's statements do not concern the specific editing processes used by MLBAM. The most reasonable way to construe the term "deleted" as used by Mann is as synonymous with "not included." BQ's contention that MLBAM performs deletion-based editing is unsupported by evidence that would be admissible.

(DSOF ¶¶ 82-86.) As a final step before approval and publication, MLBAM conducts a quality control procedure, and then publishes the Condensed Game so that it is available for download on MLB.com.[5] (PSOAF ¶¶ 28-29, 31; DRSOAF ¶ 31). Viewers can then stream the Condensed Game to an electronic device. (See DSOF ¶¶ 94, 96, 102.)

There is some dispute as to how exactly MLBAM instructed its editors to produce Condensed Games before the issuance of the '716 Patent, (see DRSOAF ¶ 15), but it is clear that before 2009, MLBAM editors were generally instructed to include "every final pitch" in Condensed Games, (PSOAF ¶ 17). At least since 2009, Condensed Games have been built by editors based on instructions provided to them by MLBAM, (DSOF ¶ 4), which have been provided in written form since at least the 2010 baseball season, (DSOF ¶ 52). Although the specific instructions have changed over time, they have generally stated that the editors can avoid "routine ground balls, routine pop outs, and routine fly balls," and that editors can or should include, inter alia, "any action that results in a hitter reaching base and what happens after they reach," "all runs scored," "any costly errors," "all [strikeout]s," "great defensive plays," and "anything historic." (DSOF ¶¶ 54, 59).

Between the 2010 season and August 2014, MLBAM produced approximately 11,770 Condensed Games. (DSOF ¶ 77.) Only 15 of the Condensed Games published by MLBAM before July 2011 included all outs in the game, and all of

---

[5] MLBAM also provides Condensed Games to content distribution network providers such as Akamai and Level 3, who then distribute the Condensed Games to end users on behalf of MLBAM. (DSOF ¶ 99; PSOAF ¶¶ 34-35.)

these Condensed Games were produced during April 2010 and April 2011, the first month of the baseball season.[6] (DSOF ¶ 72.)

B. Procedural Background

BQ filed this action on August 23, 2010.[7] (ECF No. 1 ("Compl.").) Count I of BQ's complaint alleges infringement of the '716 Patent under 35 U.S.C. § 271(a), (b), and/or (c). (Compl. ¶¶ 17-23.) Count II of BQ's complaint requests injunctive relief for the infringement alleged in Count I. (Compl. ¶¶ 24-26.) On January 3, 2011, MLBAM filed an answer and counterclaims. (ECF No. 21 ("Answer & Countercl.").) Count I of MLBAM's counterclaims requests declaratory judgment of non-infringement of the '716 Patent, and Count II requests declaratory judgment of invalidity of the '716 Patent. (Answer & Countercl. ¶¶ 37-40.)

On March 30, 2012, the Court granted defendants partial summary judgment to the effect that they cannot be liable for making Condensed Games that were filmed prior to the issuance of the '716 patent, based on the rule announced in Monsanto Co. v. Syngenta Seeds, Inc., 503 F.3d 1352, 1360 (Fed. Cir. 2007). (ECF No. 85.) Consequently, because in 2009 there were no MLB games after December 8, when the '716 Patent issued, only games filmed in 2010 or after are now at issue.

The Court entered an Opinion and Order on claim construction (the "Markman Opinion") on July 25, 2014. (Markman Op.) In the same Opinion, the

---

[6] Although BQ asks this Court to infer from the failure rate for MLBAM's quality control procedure in the 2010 and 2011 season that "an additional 31 CGs from the unaudited 2011 and 2012-14 seasons included or will include all final pitches," (PSOF ¶ 77), it is not proper for the Court to make such an assumption, as BQ's assertion is not supported by evidence that would be admissible.

[7] BQ initially filed this action in the Southern District of California. On March 14, 2011, it was transferred to this District. Judge Griesa was originally assigned to the case. It was reassigned to this Court on June 6, 2013. (ECF No. 108.)

Court also granted MLBAM partial summary judgment on the issue of provisional rights. (Markman Op. at 45.) MLBAM moved for summary judgment of non-infringement on August 20, 2014.[8] (ECF No. 200.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true

---

[8] Counsel for BQ has stated that BQ does not intend to pursue any "Doe" defendants in this action. (Declaration of Cynthia J. Rigsby, ECF No. 201 ex. F.) The instant motion thus resolves all of BQ's live claims.

nature of the facts to overcome a motion for summary judgment," as "[m]ere

conclusory allegations or denials . . . cannot by themselves create a genuine issue of

material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159,

166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In

seeking to show that there is a genuine issue of material fact for trial, the non-

moving party cannot rely on mere allegations, denials, conjectures or conclusory

statements, but must present affirmative and specific evidence showing that there

is a genuine issue for trial.").

Only disputes relating to material facts—"facts that might affect the outcome

of the suit under the governing law"—will properly preclude the entry of summary

judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts").

On a motion for summary judgment of non-infringement, the movant need

only "stat[e] that the patentee had no evidence of infringement and point[] to the

specific ways in which accused [methods] did not meet the claim limitations."

Exigent Tech., Inc. v. Altrana Solutions, Inc., 442 F.3d 1301, 1309 (Fed. Cir. 2006).

III.    DISCUSSION

Infringement can be established in either of two ways: through direct

infringement (which is also known as literal infringement), or through the doctrine

of equivalents. See J&M Corp. v. Harley-Davidson, Inc., 269 F.3d 1360, 1366 (Fed.

Cir. 2001). There is no triable issue as to whether MLBAM has committed

8

infringement of the '716 Patent under either theory, and there is therefore also no triable issue as to whether MLBAM has induced infringement or engaged in contributory infringement.

### A.    Direct Infringement.

"To establish liability for direct infringement of a claimed method or process under 35 U.S.C. § 271(a), a patentee must prove that each and every step of the method or process was performed." Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech., 709 F.3d 1348, 1362 (Fed. Cir. 2013); see also Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1582 (Fed. Cir. 1995) (direct infringement occurs when "each limitation in the asserted claim [can] be found present in the accused device or process"). The patentee must prove that the accused method or process was performed by the defendant itself or that the defendant exercised "control or direction over the entire process such that every step is attributable to [them]." Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1329 (Fed. Cir. 2008) (quotation omitted). "One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." Monsanto, 503 F.3d at 1359 (quoting Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1552 (Fed. Cir. 1989)). "[T]he patentee bears the ultimate burden of proof to demonstrate infringement by a preponderance of the evidence." Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008).

There is no triable issue as to whether MLBAM has committed direct infringement, for two reasons. First, BQ's claimed method is objective and allows little room for editorial discretion, whereas MLBAM's accused method is subjective

9

and is premised on its editors' exercising a great degree of discretion. Second, BQ's claimed method is based on deletion, whereas MLBAM's accused method is based on accretion (that is, copying and pasting). There is thus no evidence sufficient to create a genuine dispute of material fact as to whether MLBAM or anyone subject to MLBAM's direction or control performed Claim 1 Step 2 of the '716 Patent.

Claim 1 Step 2 provides for an <u>objective</u> editing process that leaves little if any discretion to BQ's editors. Indeed, BQ's counsel themselves describes BQ's invention as "follow[ing] a set of <u>objective</u> criteria" and "an <u>objective</u> algorithm," (ECF No. 207 ("Opp. Br.") at 3, 5 (emphasis added)), and at numerous points in the application process, the applicants described their claimed invention as an "objective" algorithm or method for producing a condensed version of a professional baseball game. (<u>See</u> DSOF ¶¶ 130, 133, 135-37, 139, 147-50.) This objective algorithm is most obviously encapsulated in Claim 1's requirement that <u>all</u> final pitches be included in the game recording, no matter how boring or mundane their result.

MLBAM's accused method, by contrast, relies on <u>subjective</u> decision-making. Since at least the 2010 baseball season, MLBAM has provided its editors with specific written instructions about what editors can include in Condensed Games. These instructions describe a generally subjective process—while they ask the editors to include "any action that results in a hitter reaching base and what happens after they reach," "all runs scored," and "all [strikeout]s," they also require editors to make value judgments, specifically regarding which defensive plays are

10

"great" enough, which errors are "costly" enough, and which game events are "historic" enough to merit inclusion in a Condensed Game. (See DSOF ¶¶ 54, 59.) Editors are also instructed to avoid "routine ground balls, routine pop outs, and routine fly balls," but they need not eliminate them entirely, and sometimes such plays are included in Condensed Games, as BQ acknowledges. (See Opp. Br. at 10.)

As such, MLBAM produces its Condensed Games by using a method that substantially differs from that described in the '716 Patent. Further, this method does not incorporate and build on BQ's, as evidenced by the rarity of Condensed Games that include all final pitches. Of MLBAM's approximately 11,770 published Condensed Games, the parties have identified only 15 where all final pitches are included (DSOF ¶¶ 72, 77), which represents less than approximately 0.1% of the total number of Condensed Games.

It may well be that, as BQ argues, "there is no discernable difference between [Condensed Games] that contain all final pitches as opposed to those that do not." (Opp. Br. at 10.) However, BQ's patent is for a method, not the end-product of that method. If nearly all of MLBAM's Condensed Games do not include all final pitches, MLBAM cannot be using one of the most important parts of BQ's claimed method, as reflected by its title, "Method of Recording and Playing Baseball Game Showing Each Batter's Last Pitch." ('716 Patent ll. 1:1-3 (emphasis added).)

A second reason that there is no triable issue as to direct infringement is that BQ's claimed method is based on deletion, while MLBAM's accused method is based on accretion. That BQ's claimed method is based on deletion is apparent both from

11

BQ's arguments and from the text of Claim 1 Step 2, which specifies that the game recording must be edited by "deleting" game action. ('716 Patent ll. 4:4-5.)

MLBAM does not create Condensed Games by deleting content from a recorded game. Rather, MLBAM creates Condensed Games through a subjective accretive process, by identifying and copying portions of a telecast and placing them on a timeline, generally as the game is being played. (DSOF ¶ 79; see DSOF ¶ 25.) This process is reflected in the written instructions that MLBAM has provided to its editors since at least the 2010 baseball season. (DSOF ¶ 52.)

BQ nevertheless argues that MLBAM's editing process must be based on deletion, because its editors start the editing process with a complete game recording, and end up with a final product consisting of portions of that game recording. This argument lacks merit. Even assuming that MLBAM starts its editing process with a complete game recording, which is a difficult assumption to make given that MLBAM's editors generally assemble the Condensed Game as the baseball game is being played, it does not follow that MLBAM must create Condensed Games by deletion. It is possible to reduce a full-game recording to an edited recording or a Condensed Game either by deleting material from a copy of the full-game recording and then eliminating the time gaps, or by copying portions of the full-game recording into a new recording. BQ's '716 Patent describes the former method; MLBAM uses the latter. The methods may produce similar end-products, but they are fundamentally different. Accordingly, MLBAM does not use BQ's claimed method, and thus does not infringe the '716 Patent.

12

Further, the Court rejects BQ's straw man arguments regarding "destructive" editing. Nowhere has MLBAM argued that the '716 Patent's claims are limited to "destructive" forms of deletion, meaning that the full-game recordings on which edited recordings are based are destroyed during the production process. There is a good reason for this: the '716 Patent issued in 2009, well into the digital era, and it contemplates streaming videos over the Internet, which would make any arguments premised on the idea that the patent contemplates the "destructive" editing of film or other analog recording media borderline frivolous. Moreover, as explained above, it is possible to reduce a full-game recording to a Condensed Game without using a deletion-based method of editing.

It bears mentioning that the Court <u>does not</u> grant summary judgment as to non-infringement for MLBAM because MLBAM's accused method permits the inclusion of certain additional content not permitted by BQ's claimed method. The '716 Patent only permits edited recordings to be made from material from the game recording, specifically game action from final pitches, attempts by runners to advance, and "optional material <u>from the game recording</u> including, but not limited to, original soundtrack recordings or narrative to explain play." (<u>Markman</u> Op. at 46 (emphasis added).) MLBAM's Condensed Games sometimes include additional content beyond what would be found in a game recording, specifically, graphical overlays and advertisements. (DSOF ¶¶ 82-86.) However, it does not follow that because MLBAM's method permits the inclusion of this additional content, MLBAM cannot use BQ's claimed method—if a party uses another's method for producing a

13

video and then layers additional images on top of it, they have still used the other party's method.

In a similar vein, the Court does not grant summary judgment as to non-infringement for MLBAM because MLBAM does not perform Claim 1 Step 4, which consists of "playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers." ('716 Patent ll. 4:12-14.) Under the Court's construction, "playing" the edited recording means causing a device to display it; "broadcasting" the edited recording means simultaneously sending it in a one-way transmission to multiple recipients; and "subscribers" are "subscriber-viewers" that the parties agree "either agreed or requested in some manner to view the edited recording." (Markman Op. at 46.) As both BQ and MLBAM offer their condensed baseball games for streaming over the Internet, there is a triable issue as to whether each performs this step.

In sum, MLBAM does not use BQ's claimed method, and thus does not infringe the '716 Patent. Because there is no evidence sufficient to create a genuine dispute of material fact as to whether MLBAM or anyone subject to MLBAM's direction or control performed all of the steps of the claimed method, MLBAM is entitled to judgment as a matter of law on BQ's § 271(a) direct infringement claim. Because an accused method that does not infringe an independent claim also does not infringe the associated dependent claims, it follows that MLBAM is also entitled to summary judgment on Claims 2, 3, 4, and 5.

14

B.    Doctrine of Equivalents.

There is no triable issue as to whether MLBAM infringes the '716 Patent

because MLBAM's accused method is equivalent to the method claimed by the

patent.

1.    Generally.

Under the doctrine of equivalents, "a product or process that does not literally

infringe upon the express terms of a patent claim may nonetheless be found to

infringe if there is 'equivalence' between the elements of the accused product or

process and the claimed elements of the patented invention." Warner-Jenkinson

Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997) (citing Graver Tank & Mfg.

Co. v. Linde Air Prods. Co., 339 U.S. 605, 609 (1950)). "An element in the accused

product is equivalent to a claim limitation if the differences between the two are

'insubstantial' to one of ordinary skill in the art." Amgen Inc. v. F. Hoffman-La

Roche Ltd., 580 F.3d 1340, 1382 (Fed. Cir. 2009) (citing Warner-Jenkinson, 520 U.S.

at 40). The doctrine of equivalents permits a patentee to "claim those insubstantial

alterations that were not captured in drafting the original patent claim but which

could be created through trivial changes," in recognition that "[u]nimportant and

insubstantial substitutes for certain elements could defeat the patent, and its value

to inventors could be destroyed by simple acts of copying." Festo Corp. v. Shoketsu

Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 731, 733 (2002).

The steps in BQ's and MLBAM's methods are not facially the same, but this

does not necessarily mean that the methods are not equivalent. It is theoretically

possible for a subjective or an accretive method to be equivalent to that claimed by

BQ. For example, a party could create a condensed version of a baseball game by using BQ's objective algorithm for selecting footage from a game recording, and then adding in a few short clips of subjectively chosen game footage, such as shots of fan reactions or a few foul balls. Or a party could create a condensed version of a baseball game by merely objectively copying and pasting all game action from final pitches and attempts by runners to advance into a new gapless recording, as opposed to deleting all other game action and eliminating the resulting time gaps.

However, MLBAM's accused method is not merely some trivially modified version of BQ's claimed method. Rather, as explained above, it is fundamentally different—it is <u>both</u> subjective and based on accretion, and it relies on value judgments by human editors as opposed to algorithmic rules. Accordingly, there are fundamental non-trivial differences between BQ's claimed method and MLBAM's accused method, such that it is clear that a person of ordinary skill in the art would think that there are substantial differences between the steps used by MLBAM and those claimed by BQ.

It matters not that the end-products of BQ's claimed method and MLBAM's accused method are substantially similar in some respects. As the Court has stated, there is more than one way to skin a cat—and more than one way to produce a condensed version of a baseball game. This is precisely why it is of no import to the doctrine of equivalents that MLBAM did not disclose or promote the changes to its editing process post-issuance of the '716 Patent, or that Condensed Games were approximately the same length in the year before and the year after the '716 Patent

issued. It may very well be that MLBAM's accused method produces a similar end-product to BQ's claimed method—but it is the method that BQ has patented, not the end-product.[9]

Accordingly, there is no genuine dispute of material fact, and BQ cannot show equivalence as a matter of law.[10]

### 2.   Prosecution history estoppel.

"Prosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process."

---

[9] BQ makes much of the fact that MLBAM's editors were instructed in August 2011: "[J]ust scan through the run times on the [Condensed Games] looking to make sure none are unsusally [sic] long. If one looks out of whack just check it out to make sure that at least one out is skipped along the way." (Declaration of Brett D. Kaplan, ECF No. 207 ex. K.) BQ argues that this statement shows that MLBAM's intent is to practice a fraud on the patent. But if anything, this statement is evidence of MLBAM's intent to produce results similar to BQ's without using the same method, which tends to show that MLBAM sought to avoid infringing BQ's method patent. Further, while this statement may show that MLBAM editors at times use deletion-based editing techniques, it remains the case that MLBAM's accused method is primarily based on accretive copy-and-paste editing.

[10] MLBAM argues that summary judgment in its favor on the doctrine of equivalents is warranted because BQ has not offered any expert evidence supporting this theory. This argument fails because expert testimony is not required for establishing equivalence. Although testimony by a qualified expert is "typically" offered to establish that a person of ordinary skill in the art would recognize the equivalence, "particularized testimony" by a non-expert "versed in the technology" may suffice. AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (citations omitted). Inventors are typically skilled in the art, Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005), and their testimony may therefore be used to establish equivalence, see, e.g., Forest Labs., Inc. v. Abbott Labs., 239 F.3d 1305, 1309 (Fed. Cir. 2001) (at trial, party offered testimony from primary inventor in attempt to rebut claim of infringement under the doctrine of equivalents). Here, BQ has proffered sworn statements by Gregory Mockry, the co-inventor of the '716 Patent. Whether Mockry is qualified to offer this testimony is a disputed question of fact that the Court need not now decide.

However, even assuming qualification in the art for purposes of this motion, Mockry has not offered an admissible opinion on the equivalence between the two methods because he failed to actually review one of them—as MLBAM points out, Mockry's opinion as to whether there are substantial differences between BQ's and MLBAM's editing criteria and methods is based on having viewed and compared Condensed Games to edited recordings, not on having reviewed MLBAM's editing instructions or on firsthand knowledge of how MLBAM's editors create Condensed Games. (See Reply Memorandum in Support of MLBAM's Motion for Summary Judgment of Non-Infringement, ECF No. 218 at 4 ¶ 5 (citing Declaration of Gregory M. Mockry, ECF No. 209 ¶¶ 18, 20, 22).) Accordingly, BQ's failure to provide admissible testimony by an expert or a non-expert versed in the technology provides an alternative basis for the Court's conclusion that BQ cannot show equivalence as a matter of law.

Festo, 535 U.S. at 733. There are two forms of prosecution history estoppel: argument-based and amendment-based. Voda v. Cordis Corp., 536 F.3d 1311, 1325 (Fed. Cir. 2008). Amendment-based estoppel precludes BQ from asserting the doctrine of equivalents against MLBAM with respect to Claim 1 Step 2.

Argument-based estoppel may be appropriate "[when the applicant surrenders] claim scope through argument to the patent examiner . . . ." Voda, 536 F.3d at 1325 (alteration in original) (quoting Conoco, Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349, 1363 (Fed. Cir. 2006)). To invoke argument-based estoppel, the prosecution history must evince "a clear and unmistakable surrender of subject matter." Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc., 347 F.3d 1314, 1326 (Fed Cir. 2003) (quoting Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc., 305 F.3d 1303, 1316 (Fed. Cir. 2002)). To constitute such a clear and unmistakable surrender of subject matter, "the statements in question must be such that 'a competitor would reasonably believe that the applicant had surrendered the relevant subject matter.'" Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157, 1177 (Fed. Cir. 2008) (quoting Cyber Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1457 (Fed. Cir. 1998) (en banc)).

Generally, courts will only find argument-based estoppel appropriate when the patentee has explicitly disavowed a specific feature in the prior art; additional statements meant to further distinguish the claimed invention from prior art do not constitute clear and unmistakable surrender. Compare, e.g., Deering, 347 F.3d at 1326-27 (statement made to clarify examiner's mistake and distinguish from prior

18

art did not constitute clear and unmistakable surrender of subject matter), and Eagle Comtronics, 305 F.3d at 1315-16 (patentee's use of specific claim language to further define the location of the claimed invention, a physical seal, along an interface did not amount to a surrender of claims to other seals elsewhere along the interface), with PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1367-68 (Fed. Cir. 2007) (argument-based estoppel applied to prevent patentee from asserting claim to non-rectangular-shaped frame where patentee explicitly limited its claims to a rectangular-shaped frame), and Reese v. Nortel Networks Inc., 60 Fed. App'x 274, 278 (Fed. Cir. 2003) (patentee estopped from asserting an equivalent "when he expressly disavowed that interpretation during prosecution"), and Medinol Ltd. v. Guidant Corp., 417 F. Supp. 2d 280, 310 (S.D.N.Y. 2006) (patentee estopped from asserting an equivalent because they made an "unequivocal statement" disavowing the claim at issue).

Amendment-based estoppel is appropriate "when an amendment is made to secure the patent and the amendment narrows the patent's scope." Festo, 535 U.S. at 736. Specifically, a patentee's "decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim," id. at 734, and it is therefore "presumed to be a general disclaimer of the territory between the original claim and the amended claim," id. at 740 (citation omitted). Once this presumption is established, the patentee bears the burden of "showing that the amendment does not surrender the particular equivalent in question." Id.

Although any narrowing amendment made to satisfy the Patent Act may give rise to estoppel, "there are some cases . . .where the amendment cannot reasonably be viewed as surrendering a particular equivalent." Id. at 740. For example, it may be unreasonable to view an amendment as surrendering a particular equivalent when "[t]he equivalent may have been unforeseeable at the time of the application," or when "the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question," or for "some other reason suggesting that the patentee could not reasonably be expected to have describe the insubstantial substitute in question." Id. at 740-41.

MLBAM argues that argument-based estoppel should apply to BQ because BQ repeatedly stressed that its method was distinguishable from prior art due to its "objective" nature. But BQ's statements do not amount to an explicit disavowal of any specific feature in the prior art. At most, they are an attempt to more particularly distinguish the novelty of BQ's method, and it is not clear that they identify or specify any surrendered subject matter. Further, accepting MLBAM's argument here would effectively eviscerate the doctrine of equivalents, because all patent applicants must explain with particularity how their claimed invention differs from prior art in order to obtain a patent. Accordingly, argument-based estoppel does not apply to BQ.

But amendment-based estoppel is a different story. BQ amended the editing step (what is now Claim 1 Step 2) in the course of securing the '716 Patent. Originally, the editing step consisted of "editing the recorded appearances-at-bat to

20

leave only the last pitch thrown to each player, plus any action ensuing after that
pitch and any attempts of runners on based to advance to another base." ('716
Patent Application Publication dated March 27, 2003, ECF No. 153 ex. B ("Mar.
2003 Application").) In its original form, the editing step was not particular about
the meaning of the term "editing." After the claim containing this step was rejected
for a variety of patentability reasons, BQ amended the claim to specify that "editing
the game recording of each appearance-at-bat" would be achieved by "deleting
substantially all game action other than" final pitches and attempts by runners to
advance.[11] ('716 Patent ll. 4:3-11.) As explained above, MLBAM's method is based
on subjective accretion, not objective deletion, and as such MLBAM's method falls
within the territory conceded by the amendment.

BQ therefore bears the burden of showing that the amendment does not
surrender the particular equivalent in question. This is a burden that BQ cannot
meet, as there is no reason to believe a subjective and accretive, copy-and-paste
editing method was unforeseeable at the time of the application, nor is the rationale
underlying the amendment merely tangential to the equivalent in question—
indeed, by specifying a deletion-based editing method, the amendment strikes at a
core distinguishing characteristic of the claimed equivalent. Accordingly, because
in the course of prosecuting the '716 Patent BQ changed what became Claim 1 Step
2 to clarify that "editing" means "deleting substantially all" game action other than

---

[11] BQ also amended its claims to replace the term "presenting" with "playing or broadcasting."
(Compare Mar. 2003 Application, with '716 Patent ll. 4:12-13, 4:17-18, 4:20-21.) However, this
amendment matters only if MLBAM does not play or broadcast Condensed Games, and as explained
above, this is a triable issue.

final pitches and attempts by runners to advance, BQ is estopped from asserting the doctrine of equivalents against MLBAM with respect to Claim 1 Step 2. MLBAM is therefore also granted summary judgment on § 271(a) on this alternative ground.

     C.     Inducement and Contributory Infringement.

To prevail on an inducement claim under 35 U.S.C. § 271(b) or a contributory infringement claim under 35 U.S.C. § 271(c), a plaintiff must first prove direct infringement. AquaTex, 419 F.3d at 1380 ("Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." (quoting Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993))). As established above, there is no triable issue as to whether MLBAM has directly infringed the '716 Patent. Consequently, BQ cannot prevail under § 271(b) or § 271(c).

     D.     Injunctive Relief.

Count II of BQ's complaint requests injunctive relief for the infringement alleged in Count I. Because the Court grants summary judgment for MLBAM on Count I, the Court must also grant summary judgment for MLBAM on Count II.

IV.    CONCLUSION

For the reasons stated above, the Court GRANTS summary judgment of non-infringement for MLBAM. Judgment is hereby entered for MLBAM as to Counts I and II in the Complaint and Count I of MLBAM's Counterclaims.

22

The Clerk of Court is directed to close the motion at ECF No. 200.

SO ORDERED.

Dated:       New York, New York
             December ___, 2014

_____
            KATHERINE B. FORREST
            United States District Judge